Robert PARKER et al., Plaintiffs,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, an unincorporated labor organization, Defendants.

Civ. No. 1741.

United States District Court
W. D. North Carolina,
Charlotte Division.

Jan. 25, 1963.

William W. Sturges, William J. Waggoner and Weinstein, Waggoner & Sturges, Charlotte, N. C., for plaintiffs.

William L. Stagg and Bailey & Booe, Charlotte, N. C., for defendants.

CRAVEN, Chief Judge.

The above-captioned civil action coming on for hearing, and being heard, and it appearing to the Court that the complaint was filed on January 21, 1963, and that no answer has been filed; and that the Honorable Wilson Warlick, United States District Judge of this district, issued a temporary restraining order on January 21, 1963, *ex parte* which, by its terms, temporarily restrained the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, its officers, agents, servants, employees and attorneys and all persons acting by, through or under them or either of them or by or through their order from administering the affairs of Local 71 under trusteeship or otherwise until January 29, 1963; and further directing the International to turn over to the elected officers and trustees of Local 71 all the assets, property (including the building and keys), books and records of Local 71;

This restraining order was made returnable before the undersigned District Judge on the 29th day of January, 1963, at Statesville, North Carolina;

Subsequent to its entry the defendant, hereinafter called the "Union" gave notice of appeal to the Court of Appeals for the Fourth Circuit, and the appeal was argued in that Court on January 23, 1963; thereupon, the Court of Appeals remanded the case to this District Court "for an immediate hearing on the merits", said remand being filed in this Court on January 24th, 1963;

Thereupon, the undersigned District Judge proceeded to hear evidence and argument of counsel beginning at 10:00 A.M. on January 24th, 1963, and concluding at 6:20 P.M. on the same day; during the hearing the parties, through their counsel of record in open court, made the following stipulation and agreement:

"All questions propounded to witnesses are deemed objected to; all objections are deemed waived unless renewed in writing after a transcript of the testimony has been made available to counsel."

Counsel contemplate ordering a transcript of the hearing conducted on yesterday and, in view of their agreement, due process requires that findings of fact made at this time be subject to an opportunity being afforded counsel to renew objections to evidence and direct the Court's attention to any findings of fact that may not be supported by competent evidence.

The matters in controversy are deemed by the Court to be of such urgency that tentative findings of fact must be made presently and without waiting for the transcription of the testimony and that an order must be entered immediately subject to correction or change as may subsequently be required; now, therefore, the Court proceeds to find the facts to be, from notes and memory, as follows:

1. During the period from December 18 to December 22, 1962, a duly authorized election of officers and trustees of Local 71 was conducted in Charlotte, North Carolina. This election was conducted under the supervision of F. W. Pearson who was employed for that purpose by the former officers of Local 71, hereinafter referred to for convenience as "Hargett". Pearson was not a mem-

ber of the Union and is a person engaged in various activities of a non-union nature including the sale of voting machines and auctioneering. Although subpoenaed to appear at this hearing by plaintiffs he was not present at this hearing due to his absence from Charlotte and the inability of the Marshal to serve him.

2. At the close of the balloting at 6:00 P.M. on December 22, 1962, Pearson and disinterested persons employed by him to conduct the election counted the ballots. The results of the ballot count were as follows:

### FOR PRESIDENT

| | |
|---|---|
| W. C. Barbee | 1112 |
| Ed. Hargett | 709 |
| M. L. Linker | 105 |
| Frank Young | 77 |

### FOR VICE-PRESIDENT

| | |
|---|---|
| Robert C. Cress | 926 |
| B. L. Elliott | 652 |
| Jack Kennedy | 391 |

### FOR SECRETARY-TREASURER

| | |
|---|---|
| H. C. Honeycutt | 1195 |
| J. E. Wilson | 675 |

### FOR RECORDING SECRETARY

| | |
|---|---|
| J. W. Dubbs | 605 |
| James L. Roberts | 1322 |

### FOR TRUSTEE

| | |
|---|---|
| Guy E. Alexander | 572 |
| Coy Ballard | 168 |
| J. B. Barrett | 195 |
| William Ballinger | 231 |
| M. C. Carriker | 804 |
| R. L. Combs | 220 |
| D. F. Davis | 758 |
| W. H. Franks | 208 |
| B. W. Herndon | 191 |
| L. T. Love | 166 |
| G. W. Lynch | 402 |
| George Moore | 257 |
| W. F. Scott | 799 |
| D. K. Shaw | 288 |
| D. L. Thompson | 145 |

The persons who assisted Mr. Pearson in the conduct of the election were Mrs. R. O. Fortenbery, former Secretary of the Mecklenburg County Board of Elections; Mrs. Louis Minnick; Mrs. Richard Katz; Mrs. W. A. Shaw; Mrs. David T. Stiles; Mrs. Joyce Hager. No evidence was offered at the hearing to indicate that any one of these persons had any interest in the union or in "Hargett" or in any candidate or group of candidates running for election. The Court finds as a fact from the demeanor, expression, and the testimony of these witnesses that they are all disinterested and were disinterested at the time of their participation in the conduct of the election. No evidence was offered to impeach any one of the foregoing witnesses who conducted the election and the Court is of the opinion and finds that each and every one of them is a person of good character.

3. The methods and procedures and the facts of the conduct of the election are virtually undisputed by the parties. All of these witnesses who conducted the election were offered by the plaintiffs. After Mrs. Fortenbery had testified, counsel for the defendant stipulated as to most of the subsequent witnesses on this aspect of the case that they would testify substantially as had Mrs. Fortenbery. By the testimony of these witnesses it is established beyond peradventure of doubt that the election was conducted with care and diligence and that more than ordinary precaution was taken by the persons conducting it to assure a valid election. Identification slips were used to identify each voter. These slips contained the name of the prospective voter verified to by the signature of a regular employee of the Union, either Mrs. Young or Mrs. Watson. The persons conducting the election had available the signatures of Mrs. Young and Mrs. Watson and checked the identification slip against that signature before issuing a ballot. After being issued a ballot privacy was afforded each voter to mark it and it was then deposited in a metal box approximately thirty inches square and secured by four different locks. At the end of voting on each day the open slot in the box was further secured by lock and by seal and the box was kept in the possession of Mrs. Fortenbery and taken by her to her home each night. No evidence was of-

fered indicating in the slightest degree that there was any tampering with the box at any time during the entire election, and the Court finds as a fact that it was not tampered with and not opened until the close of the election. When the box was opened at the close of the election, one of the locks securing it would not respond to key and had to be broken in order to get into the box.

4. The Court further finds that the procedures for counting ballots were carefully devised and carefully explained to all parties and participants and were, in fact, designed to assure a fair and accurate counting of the ballots. Mr. Pearson took more than an hour to explain to every participant his duty and responsibility in connection with making the tally. Each person knew what he was supposed to do and there is not the slightest scintilla of evidence that he either failed to understand or did not properly execute his responsibility. Four tables were set up and four tally sheets were used in the counting. After completion of the count, a final tally sheet was composed representing the four separate tallies and constituting a total of them. Before the ballots were counted Mrs. Fortenbery and Mr. Pearson examined the ballots and determined that not more than fifty and in Mrs. Fortenbery's opinion no more than twenty-five were spoiled and totally ineffective. If it be assumed that fifty were involved, such a number would not have and could not have effected the result of the election. Some others, undetermined in number, were partially defective but there is no intimation in any of the evidence that the determination of spoilage was improper or other than necessary. Mrs. Fortenbery explained that spoiled ballots consisted of situations where the voter had marked more than one person for president or more than three persons for trustee (there being only three vacancies). The exclusion of ballots by reason of spoilage was not contested at the hearing and no contention was made by either of the parties that the election be held invalid for that reason. All of the evidence tends to show that determination of spoilage of ballots was properly made and it is determined, in any event, that an insufficient number of ballots are involved to have affected the election.

5. After the election results had been announced as contained in the foregoing paragraph #2, Mr. Pearson extended an invitation to all persons present to protest or object to the conduct of the election and the counting of ballots. No one protested. Thereupon Mr. Pearson inquired if anyone wanted the ballots which had been put back in the ballot box. There was no response to his inquiry. Apparently Pearson took the ballots and said that he put them in the trunk of his automobile and that they were subsequently stolen as has previously been indicated. Mr. Pearson was not present at the hearing nor is his affidavit offered in court. There is no competent evidence from which the Court can find that the ballots were stolen. No one, apparently, is in a position to say what happened to them except Mr. Pearson who did not testify either personally or by affidavit. The fate of the ballots is in the realm of speculation and conjecture and the Court is unable to determine what became of them; be that as it may, the tally sheets were kept by Mrs. Fortenbery in her possession and have not been tampered with or changed and were presented to the Court and offered in evidence, and the tally sheets show the vote to have been that stated in paragraph 2 supra.

6. The counting of the ballots was completed late in the evening of December 22, 1962; *after* the ballots had been completely counted and the process entirely finished and after the completion of entries upon the tally sheets reflecting the count, *for the first time* (of several) the lights went out. The witness Dietrich says that the lights went out because somebody turned them off. However, Mr. Dietrich was not present and his evidence is not sufficient to support a finding. No evidence was offered at the hearing to explain the lights going off. The most probable conjecture (not a finding) is that someone, indeed, turned them off.

Speculating further, (and not a finding) it is difficult to imagine that the apparent winners of the election would have any motivation for turning off the lights. But all this is in the realm of conjecture and the Court finds that there is no evidence of any sort whatsoever in the record to determine the reason or responsibility for the lights having gone off. *All* of the evidence tends to show that the lights going out could not and did not affect in any way the result of the election. At the first time of light failure the count had been completed and entered on tally sheets. Even so, out of an abundance of caution, Mrs. Fortenbery stood with her hand upon the box containing the ballots and when she moved away from it caused Mrs. Stiles to sit upon it until the lights came on again.

7. On December 23, 1962, Mr. Pearson was notified that "Hargett" requested a recount of ballots. Despite this, Mr. Pearson apparently allowed the ballots to remain in the locked trunk of his automobile and reported that they had been stolen sometime prior to the evening of December 25.

8. On January 8, 1963, Albert L. Dietrich, an agent of the Union, began conducting an investigation of the election. Mr. Dietrich's investigation consisted largely of securing statements from the opposing candidates. He did not interview any of the persons charged with the conduct of the election except Pearson. What Pearson may have told him is not corroborated for the simple reason Pearson was not a witness. On January 10 or 11 Mr. Dietrich telephoned a vice-president of the Union in Washington, giving him the vote results and telling him the substance of what was in the twenty conflicting statements of the various candidates. Dietrich also telegraphed James R. Hoffa, General President of the Union, on January 11, 1963, at 1:08 P.M. (Plaintiffs' Exhibit 17) advising that Pearson had said the lights went out four times before the final completion and certification of the election results and that Pearson said that the ballot box with the ballots had been stolen

and that Pearson said he will not certify the results of the election. This telegram also gave the results of the election. On the same day, January 11, and without getting any further information except that given in the telephone conversation to Mr. Gibbons, Vice-President of the Union, the General President of the Union instituted the trusteeship.

Pearson is owed $1,500.00 for his work in conducting the election and has not been paid.

9. The Court finds as a fact that the General President of the Union acted on January 11, 1963, without having caused to be made a fair investigation of the election and without having the benefit of the disinterested testimony of the persons who conducted the election and who were heard by this Court.

10. On January 12 Dietrich, designated by Vice-President Flynn, took over the affairs of the local union as agent for Trustee Flynn, and on January 14 completed the transition of control by changing all of the locks at the union hall.

No hearing was conducted by the Union before Local 71 was placed in trusteeship. On January 14, 1963, the General President of the Union advised Trustee Flynn that he had appointed a panel to conduct a hearing for the purpose of determining whether the temporary trusteeship should be continued or dissolved and that such a hearing would be held on Tuesday, January 29, 1963.

11. Sometime in October, 1962, W. C. Barbee, President-elect, James L. Roberts, Recording Secretary-elect, and Edward Hill, a supporter of Barbee and the winners in the election, testified for the United States in a criminal proceeding against Ed Hargett, John Edgar Wilson and Guy E. Alexander, who were previous officers and trustees of the local union. Plaintiffs contend that such testimony is obnoxious to the International Union and affords motivation for the International President to favor "Hargett". Such an inference is not sufficiently supported by the evidence in this proceeding. It remains in the realm of conjecture.

12. After Dietrich took over Local 71 he resumed employment of "Hargett" by making Ed Hargett and others of the former officers business agents of the Union; the result is to perpetuate in management and control "Hargett" although subordinate to and under the direction of Dietrich;

13. That because of Dietrich's demonstrated intention to continue the former officers in employment as business agents, the result will be to continue their control substantially and to perpetuate and improve their influence upon any subsequent election that might be held; that by reason thereof, irreparable harm would be accomplished as to the plaintiffs.

 Upon the foregoing findings of fact the Court tentatively concludes:

1. No emergency within the meaning of the constitution of the Union existed on January 11, 1963, sufficient to justify the imposition of trusteeship.

2. The trusteeship was not established pursuant to the first alternative basis contained in 29 U.S.C.A. 464(c); that is to say, it was established before a fair hearing before the Executive Board or other body of the Union.

3. Although the Union has not had sufficient opportunity to ratify such action after a fair hearing (which procedure is authorized by the statute), the Court concludes as a matter of law on the basis of all of the evidence that a fair hearing could not result in a determination of an emergency so as to justify the imposition of trusteeship.

4. The Court concludes that the trusteeship established by the Union in this case was *not* established for any of the statutory purposes enumerated in 29 U.S.C.A. Section 462.

5. Irreparable harm will result to plaintiffs unless the Union is enjoined from imposing the trusteeship.

██ Now, therefore, upon the foregoing findings of fact and conclusions of law (which are necessarily tentative and subject to correction as may be deemed necessary), It is ORDERED, ADJUDGED AND DECREED that the defendant International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, its officers, agents, servants, employees and attorneys and all persons acting by, through or under them or either of them or by or through their order, be and they are hereby enjoined from administering the affairs of Local 71 under trusteeship or otherwise and they are hereby ORDERED and directed to continue the elected officers and trustees of Local 71, to wit: W. C. Barbee, President, Robert C. Cress, Vice-President, H. Grady Honeycutt, Secretary-Treasurer, James L. Roberts, Recording Secretary and M. C. Carriker, W. F. Scott, and D. F. Davis, Trustees, in possession of all the assets, property (including the building and keys), books and records of Local 71;

Provided, however, that this preliminary injunction shall not operate to prevent Dietrich from affording such assistance and advice *as may be requested* by the new officers in discharge of their duties;

During the hearing H. Grady Honeycutt, newly elected Secretary-Treasurer, indicated that he had not yet consented to enter upon his duties; in the event Mr. Honeycutt does not accept the duties and responsibilities of the office to which he has been elected, the Court retains jurisdiction for the purpose of considering the appointment of a receiver to discharge the responsibilities of that office.

This preliminary injunction shall continue until the trial of the matter or until it may be superceded on appeal by mandate of the Court of Appeals for this Circuit.

It is conditioned upon the filing by plaintiffs of a bond in the amount of $3,000.00, which bond shall provide that the plaintiffs will pay to the Union such damages not exceeding $3,000.00 as it may sustain by reason of the granting of this preliminary injunction, if the Court finally decides that plaintiffs are not entitled thereto.